```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
STEPHANIE RIVERA

                    Plaintiff,                    MEMORANDUM AND ORDER
                                                  18-CV-00624
      - against -


STEINWAY MEDICAL, P.C. d/b/a FAST
MEDICAL, and SANJIV CHOPRA, *jointly
and severally*,

                    Defendants.
----------------------------------------------------------x
```
GLASSER, Senior United States District Judge:

      Plaintiff Stephanie Rivera brings this action against Steinway Medical, P.C. d/b/a Fast Medical ("Steinway") and Sanjiv Chopra (collectively, "Defendants"), for (1) failure to pay overtime wages and retaliation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* and New York Labor Law ("NYLL") § 190 *et seq.*; (2) failure to comply with the notice and recordkeeping provisions of the NYLL; and (3) gender discrimination and retaliation in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.* and New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8–101 *et seq.* (ECF No. 1). Plaintiff now moves for summary judgment as to liability only under Rule 56 of the Federal Rules of Civil Procedure. As set forth below, her motion is **GRANTED** in part and **DENIED** in part.

# BACKGROUND[1]

Except where otherwise indicated, "a reasonable trier of fact, weighing the conflicting evidence and resolving all ambiguities and credibility determinations in [the nonmovant's] favor, could infer that the following events transpired." *Grant v. City of New York*, 15-CV-3635 (ILG) (ST), 2019 WL 1099945, at *2 (E.D.N.Y. Mar. 8, 2019).[2]

Plaintiff worked as an office assistant at Steinway—an urgent care clinic in Astoria, New York—from June 20, 2017 through December 14, 2017. (ECF No. 36, "Chopra Decl." ¶¶ 2, 9; ECF No. 7, "Answer" ¶¶ 2, 51). Plaintiff's responsibilities included answering phones, making appointments, and helping patients. (Chopra Dep. 69:21-25). At all relevant times, Chopra served as Steinway's sole owner, agent, and manager. (*Id.* at 92:19-22; Answer ¶ 58). Steinway maintained between five and nine employees at any given time, but only Chopra was responsible for supervising Plaintiff, setting her work schedule, and determining her pay. (Chopra Dep. 24:2-23, 29:21-24; Answer ¶ 60).[3]

Although her hours were originally Monday through Friday from 10 a.m. to 6:30 p.m., Plaintiff consistently worked from 9:00 a.m. to approximately 7:00 p.m. (Chopra Dep. 83:25-

---

[1] The facts in this Memorandum are drawn from Plaintiff's Local Rule 56.1 Statement (ECF No. 28); papers submitted with the parties' briefs; and the Deposition of Sanjiv Chopra, M.D. (ECF No. 29-2, "Chopra Dep."). Plaintiff's opening brief is referred to as "Br." (ECF No. 27), and Defendants' opposing brief as "Opp'n" (ECF No. 35).

[2] Defendants failed to comply with Local Rule 56.1(b), which requires a party opposing summary judgment to submit a counterstatement to the moving party's Local Rule 56.1 statement of undisputed facts. Although Defendants did not file a counterstatement, they submitted a declaration which controverts statements made in Plaintiff's 56.1 Statement. In light of this evidence, the Court will not deem the facts in Plaintiff's 56.1 Statement admitted, but will consider the full record in ruling on the motion.

[3] Defendants stipulate that, at all relevant times, Steinway's annual gross volume of sales was not less than $500,000. (ECF No. 17). Defendants do not dispute that Steinway is also a business engaged in interstate commerce.

84:14; Chopra Decl. ¶ 2). Her starting wage of $13 per hour eventually increased to $16, paid in check and cash.[4] (Chopra Dep. 73:10-24, 76:2-8, 92:2-5; Rivera Decl. ¶ 12). Plaintiff received $300 in weekly checks her first two months, which thereafter increased to $330, when Plaintiff agreed to park and retrieve Chopra's car each day. (Answer ¶ 37; Chopra Decl. ¶ 7; Chopra Dep. 163:8-15). Because they were friends, Chopra claims he "paid her more than she worked," and gave her an additional $250 cash per week, which supposedly included overtime wages.[5] (Chopra Decl. ¶ 7; Chopra Dep. 127:2-11).

Although Plaintiff was paid regularly, Defendants failed to maintain any records reflecting the hours she worked. (Chopra Dep. 92:10-18). In fact, Defendants did not formally track employee hours. (*Id.* at 82:17-20, 83:5-12). Nor did Defendants keep records of cash payments to employees. (*Id.* at 151:4-16). With the exception of her first paycheck, Defendants did not provide Plaintiff with any wage statements. (*Id.*; Opp'n 5 ("it has been conceded that the Defendants did not provide any wage statement or notices to the Plaintiff")).

After being hired, Plaintiff began texting Chopra on weekends and the two developed a close friendship. (Chopra Decl. ¶ 4; Chopra Dep. 131:19-21). Plaintiff confided in Chopra, who learned that: "her father left her at a very young age. She missed her father. She had bad thoughts about herself. She thought she was . . . ugly. She thought her eyes were not right. She thought her forehead was big, lips were bad." (Chopra Dep. 112:14-113:15). Chopra tried to "help" her as a friend. (*Id.*). Because she "did not like her face," Chopra gave her compliments "to make her feel better about herself." (Chopra Decl. ¶ 4).

---

[4] Plaintiff claims that her wage eventually increased to $17 per hour in November 2017. (ECF No. 30, "Rivera Decl." ¶ 12).

[5] Plaintiff asserts that Chopra made cash payments contingent on how "happy" she made him "by giving in to his requests for hugs and kisses." (*Id.* ¶ 9).

Plaintiff told Chopra she liked receiving text messages from him and taught him to use "XOXO" to signify "hugs and kisses." (*Id.*; Chopra Dep. 169:2-6; Rivera Decl. ¶ 15). Chopra would frequently ask Plaintiff to send him "hugs and kisses" via text, which, according to Chopra, she did without objection.[6] (Chopra Dep. 121:16-19). The two also sometimes referred to each other as "majesty," "queen," or "bubbly." (*Id.* at 134:2-136:5). At times, Chopra called himself "daddy" via text because Plaintiff "liked it" and she "missed" her father.[7] (*Id.* at 112:8-11, 113:10-18, 114:23-24). While Chopra concedes some of his messages could be interpreted sexually, he insists he was not interested in her romantically, nor did he believe she was interested in him.[8] (*Id.* at 119:6-15, 126:21-25). The two never had a physical relationship and, as Chopra understood it, they were just friends.[9] (*Id.* at 131:19-21). In fact, Chopra believed it was Plaintiff who initiated their interactions. (*Id.* at 101:18-23).

Their friendship began to erode towards the end of Plaintiff's employment, when she developed "animosity towards everybody in the office." (*Id.* at 98:16-20). Chopra "think[s] everything changed" when her grandmother came to the United States and Plaintiff realized she was "not going to make enough money." (*Id.* at 169:19-170:5). At that point, Plaintiff's "whole attitude changed." (*Id.*). It appeared as though she "was looking for a reason to be fired." (*Id.* at

---

[6] Plaintiff first thought these requests were "friendly gestures," but alleges that Chopra's behavior became "more harassing and offensive" as her work continued. (*Id.* ¶¶ 13-14).

[7] Plaintiff insists she always referred to Chopra as "Dr. Chopra." (*Id.* ¶ 3).

[8] Plaintiff contends she received "unwelcome sexual text messages" from Chopra, where he would request "xxx," short for "hugs and kisses." (*Id.* ¶ 15). Plaintiff apparently told Chopra on October 25, 2017 that she did not want to send him "hugs and kisses frequently." (*Id.* Ex. A at 00016-17). In response, Chopra allegedly reduced her compensation. (*Id.* ¶¶ 19-21).

[9] Plaintiff claims that, in November 2017, Dr. Chopra frequently requested that they hug alone in a room, where he would press his body on to her and touch her breasts. (*Id.* ¶ 17). Chopra also allegedly requested they spend time alone in his car, during which he would "reach" for her breasts. (*Id.*).

99:8-22). As relations soured, Chopra stopped paying Plaintiff "extra" cash and deleted text messages from her. (*Id.* at 127:25-128:5, 147:14-25).[10] Tensions soon escalated.

Around November 2017, Plaintiff told Chopra that she "wanted to work two less days and fewer hours but under the same weekly pay," and threatened to "expose" him unless he agreed to the "new arrangement." (Chopra Decl. ¶ 8; Chopra Dep. 99:8-22). Chopra suspected Plaintiff had become "dangerous" to the point that she was willing to create "some ruse or some incident" to sue Defendants. (Chopra Dep. 100:10-21). On December 14, 2017, Chopra terminated Plaintiff, and told her that "she was a liar and was attempting to blackmail [him]." (Chopra Decl. ¶ 9). At the time she was dismissed, Chopra claims: "I gave her all outstanding pay in front of [coworker] Evelyn Sosa and she left saying that I had paid her correctly."[11] (*Id.*).

Chopra provides the following reasons for Plaintiff's termination: she (1) wanted to work "two less days and fewer hours" for the same pay (*Id.* ¶ 8); (2) unilaterally reduced her hours (*Id.*); (3) developed "animosity towards everybody in the office" (Chopra Dep. 98:18-20); and (4) "blackmailed" Defendants and threatened to sue unless Chopra acceded to her demands. (Chopra Decl. ¶ 9; Chopra Dep. 99:17-20). Although Chopra admits the threat of legal action was one of "multiple" factors in her termination, (Chopra Dep. 98:7-15), he believed that Plaintiff "orchestrated" the "entire situation" to sue Defendants. (*Id.* at 169:13-18).[12]

---

[10] The parties allegedly deleted text messages at Chopra's insistence. (Chopra Dep. 124:11-16; Rivera Decl. ¶ 16). Although Plaintiff captured screenshots of certain texts prior to their deletion, it is unclear whether she saved all of the deleted messages. (Rivera Decl. ¶ 16).

[11] Chopra does not specify what "outstanding pay" he gave to Plaintiff. (Chopra Decl. ¶ 9).

[12] On December 8, 2017, Plaintiff texted Chopra her concern regarding fluctuations in pay. (Rivera Decl. ¶ 23). On December 14, 2017, she allegedly complained to Chopra regarding unpaid overtime and unwanted sexual attention. (*Id.* ¶ 24). Plaintiff was fired that day. (*Id.*).

5

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (citations omitted). The moving party bears the burden of establishing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted). The Court's role is one of "issue-finding," not "issue-resolution." *Ramirez v. New York City Bd. of Educ.*, 481 F. Supp. 2d 209, 216 (E.D.N.Y. 2007).

Although the Second Circuit applies the same standard in employment discrimination cases, courts are particularly cautious to grant summary judgment where intent is at issue. *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). In these cases, summary judgment is rarely granted because "a victim of discrimination is . . . seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence. . . . Consequently . . . where a defendant's intent and state of mind are placed at issue, summary judgment is ordinarily inappropriate." *Ramirez*, 481 F. Supp. 2d at 216 (quoting *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991)).

# DISCUSSION

## I. Liability Under the Applicable Statutes

Defendants do not dispute that they are "employers" within the meaning of the FLSA, NYLL, NYSHRL, or NYCHRL. Indeed, the record shows that Chopra—as sole owner and manager of Steinway—set Plaintiff's schedule, determined her hours, paid her wages, and participated in the conduct giving rise to her claims. (Answer ¶¶ 2, 58, 60-62). Accordingly, Defendants may be liable under the applicable statutes.

## II. Notice and Recordkeeping Violations Under NYLL

Defendants also do not dispute that they failed to comply with the notice and recordkeeping provisions of NYLL § 195. (Opp'n 5 ("it has been conceded that the Defendants did not provide any wage statement or notices to the Plaintiff")). Sections 195(1) and (3) of the NYLL require that employers provide new hires with notice regarding the key terms of their employment, and wage statements at each pay period. NYLL § 195(1)(a), (3). Defendants concede they did not do so. (Opp'n 5; Chopra Dep. 92:6-18, 151:11-16). In light of Defendants' admitted failure to comply with NYLL § 195(1) and (3), summary judgment is granted on both claims.

## III. FLSA and NYLL Claims for Overtime Wages

The FLSA and NYLL require that employees be paid at least one-and-a-half times their regular rate for every hour worked in excess of forty each week. *See* 29 U.S.C. § 207(a)(1); N.Y. Comp. Codes R. & Regs. tit. 12, § 142–2.2. The burden of showing that she was not paid overtime wages rests with the employee (or plaintiff). Where, as here, an employer fails to comply with its recordkeeping obligations, the employee may carry her burden of proof by testifying to her recollection of the hours worked and the compensation received, even if the calculation is only approximate. *Garcia v. Village Red Rest. Corp.*, No. 15 Civ. 6292 (JCF), 2017 WL 3493148, at

7

*1 (S.D.N.Y. Aug. 14, 2017). The burden then shifts to the employer who must come forward with evidence of the precise number of hours worked or with evidence to negate the reasonable inferences drawn from the employee's evidence. *Id.* As Chopra's own admissions affirm, Defendants failed to carry their burden.

Chopra admits that Plaintiff was paid weekly checks of $300 or $330, and "a total" of $250 cash each week, which supposedly "included" overtime wages. (Answer ¶ 37; Chopra Decl. ¶ 7). Thus, Plaintiff was paid—at most—$580 per week.[13] This was insufficient to meet Defendants' overtime obligations.

Plaintiff has sworn, under penalty of perjury, that she worked a total of 45 hours per week, at $13 per hour, her first two months. (Rivera Decl. ¶ 10). Chopra himself testified that she worked from 9 a.m. to approximately 7:00 p.m.—a total of nearly *50 hours* per week.[14] (Chopra Dep. 83:25-84:14). At $13 per hour, Plaintiff was owed $520 for her first 40 hours of work ($13 x 40 hrs.), and $97.50 for 5 hours thereafter. Plaintiff was owed $617.50 for a 45-hour week, well-exceeding the total amount Plaintiff allegedly received. Furthermore, Plaintiff's wage increased to $13.50 per hour in the beginning of October 2017, $16 per hour later that month, and $17 per hour in November 2017. (Rivera Decl. ¶ 12). Chopra's testimony confirms that Plaintiff's wage increased to around $16 per hour before she was terminated. (Chopra Dep. 76:2-8, 92:2-5).

The evidence adduced by Defendants is practically non-existent. In what little they offer, Defendants provide no more than conclusory assertions that Plaintiff was paid "overtime."

---

[13] This also assumes that Plaintiff received $330 in weekly checks, which she only received *after* her first two months on the job. (Rivera Decl. ¶ 9; Answer ¶ 37).

[14] Chopra's testimony conflicts with his declaration that Plaintiff's hours were from 10:00 a.m. to 6:30 p.m., a total of 42.5 hours per week. (Chopra Decl. ¶ 2). However, even under this calculation, Plaintiff was owed overtime wages and her total compensation, as discussed above, was insufficient. Plaintiff states she did not take meal breaks and, in any event, Chopra did not deduct any time for meal breaks. (Rivera Decl. ¶ 10; Chopra Dep. 84:15-19).

(Chopra Decl. ¶ 7). This scintilla of evidence is not enough to withstand summary judgment. Thus, Plaintiff's motion is granted as to overtime claims under the FLSA and NYLL, with damages to be determined at trial.

IV.     **Retaliation Under the FLSA & NYLL**

Plaintiff also seeks summary judgment on her FLSA and NYLL retaliation claims. To prevail, Plaintiff must establish a *prima facie* case of retaliation by demonstrating "(1) participation in protected activity known to the defendant, like the filing of a FLSA [or NYLL] lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010). The burden then "shifts to the defendant to articulate a 'legitimate, non-discriminatory reason for the employment action.'" *Id.* (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)). In response, the plaintiff must produce "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Id.*

Defendants do not dispute that Plaintiff makes a *prima facie* case. Rather, they offer competing, non-retaliatory explanations for her termination. Among these reasons, Defendants assert that she (1) sought to work "two less days and fewer hours" for the same pay; (2) unilaterally reduced her hours; (3) developed "animosity towards everybody in the office"; and (4) "blackmailed" Defendants. (Opp'n 7-8; Chopra Decl. ¶¶ 8-9; Chopra Dep. 98:18-20). These explanations give rise to a disputed issue of material fact: whether Plaintiff's dismissal was prompted by a retaliatory motive. Thus, summary judgment is denied.

## V. Claims Under the NYCHRL & NYSHRL

### A. Retaliation

Summary judgment is also precluded as to Plaintiff's NYCHRL and NYSHRL retaliation claims. As required by the Second Circuit, courts must review NYCHRL claims "independently from," and more liberally than, federal and state law. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). Because the NYCHRL affords greater protections, the Court's analysis focuses on Plaintiff's NYCHRL claims. *See Davis v. Goodwill Indus. of Greater New York & New Jersey, Inc.*, No. 15 Civ. 7710 (ER), 2017 WL 1194686, at *13 (S.D.N.Y. Mar. 30, 2017) (noting that the "NYCHRL affords 'broader protections' than the NYSHRL" (citation omitted)).

Section 8–107 of the NYCHRL prohibits employers from retaliating "in any manner against any person because such person has . . . opposed any practice forbidden under this chapter." N.Y.C. Admin. Code § 8–107(7). Even under the broadly construed NYCHRL, a "plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (citations omitted). To prevail, there must be "a causal connection between her protected activity and the employer's subsequent action, and must show that a defendant's legitimate reason for her termination was pretextual or 'motivated at least in part by an impermissible motive.'" *Russo v. New York Presbyterian Hosp.*, 972 F. Supp. 2d 429, 456 (E.D.N.Y. 2013) (quoting *Brightman v. Prison Health Serv., Inc.*, 108 A.D.3d 739, 741, 970 N.Y.S.2d 789 (2d Dep't 2013)).

Here, Plaintiff alleges she was terminated from Steinway after complaining about gender discrimination, namely, Chopra's unwanted sexual attention. (Br. 15-17). As a condition of her

employment, she claims that Chopra required her to text him "hugs and kisses," and allegedly groped her. (*Id.* at 15-20). As a result, Plaintiff claims, her pay was reduced and she was ultimately fired. (Rivera Decl. ¶¶ 19-24).

The record shows a dispute of material fact as to whether Plaintiff's termination was "caused at least in part by . . . retaliatory motives." *Mihalik*, 715 F.3d at 113. Defendants offer non-retaliatory reasons for her termination, including Plaintiff's animosity towards others, her unauthorized reduction in hours, and alleged blackmail. (Chopra Decl. ¶¶ 8-9; Chopra Dep. 98:18-20). Defendants' explanations give rise to issues of fact not properly decided at this stage. *See, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."). Accordingly, summary judgment is denied as to Plaintiff's retaliation claims under the NYCHRL and NYSHRL.

### B. Gender Discrimination

Plaintiff's motion is also denied as to gender discrimination under the NYCHRL and NYSHRL. As is well-established, "gender discrimination claims under the [NYCHRL] are subject to a more liberal judicial construction than those brought under state or federal law." *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 581 (S.D.N.Y. 2012), *aff'd*, 526 F. App'x 124 (2d Cir. 2013). "[A] plaintiff must only show differential treatment of any degree based on a discriminatory motive." *Thomson v. Odyssey House*, No. 14-CV-3857 (MKB), 2015 WL 5561209, at *24 (E.D.N.Y. Sept. 21, 2015) (quoting *Gorokhovsky v. N.Y.C. Hous. Auth.*, 552 Fed. App'x 100, 102 (2d Cir. 2014)), *aff'd*, 652 F. App'x 44 (2d Cir. 2016). This permissive standard, however, does not ensure success at summary judgment. While "even a single comment may be actionable in the

proper context," the NYCHRL, "is not a general civility code." *Mihalik*, 715 F.3d at 113. To prevail, there must be "a discriminatory motivation" for the underlying acts. *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 258 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013).

The record shows disputed issues of material fact concerning Defendants' motives. Chopra testified that Plaintiff was a close friend, that he never had physical contact with her, and that any changes in the conditions of her employment were brought about by non-discriminatory reasons, such as her allegedly unauthorized reduction in hours and her animosity towards others. (Chopra Decl. ¶¶ 4-5, 8-9; Chopra Dep. 98:18-20, 112:12-113:18, 168:5-8). Were a jury to credit Chopra's testimony, it could reasonably find that Plaintiff was not discriminated against. Whether or not to credit Chopra's testimony, however, is for the jury to decide.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is **GRANTED** in part and **DENIED** in part. Plaintiff's motion is **GRANTED** as to her claims for violations of the notice and recordkeeping requirements of NYLL § 195(1) and (3), as well as her claims for overtime wages under the FLSA and NYLL, with damages to be determined at trial. Plaintiff's motion is **DENIED** as to all remaining claims.

SO ORDERED.

Dated: Brooklyn, New York
October 15, 2019

/s/
I. Leo Glasser          U.S.D.J.